[Cite as *State v. Smith*, 2021-Ohio-2654.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-200352 |
| | | TRIAL NO. B-1905631 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| ARTHUR SMITH, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: August 4, 2021

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Krista Gieske,* Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1} The state of Ohio appeals from the judgment of the Hamilton County Court of Common Pleas granting defendant-appellee Arthur Smith's motion to suppress a firearm obtained after a warrantless search of the vehicle he was driving. For the following reasons, we affirm the trial court's judgment.

## Procedural and Factual Background

{¶2} Arthur Smith was charged with having a weapon while under a disability, carrying a concealed weapon, and improperly handling a firearm in a motor vehicle. Smith filed a motion to suppress the firearm, challenging the warrantless search of the vehicle he was driving. At the hearing on the motion, the state argued that Smith had no standing to assert a constitutional violation because the registered owner of the vehicle, Shavonda Washington, had filed a criminal complaint the previous day alleging that Smith refused to return the vehicle to her. The state also argued that Washington consented to the search, and that the search was a proper inventory search.

{¶3} Smith contended that he had a reasonable expectation of privacy in the vehicle based upon his possession and use of the vehicle and an equitable interest in the vehicle. He further argued that Washington was not asked for her consent to search, and that the search was not a lawful inventory search.

{¶4} The state presented the testimony of the two officers involved in the arrest and search of the vehicle, Deputy Rylan Babbs and Deputy Todd Rizzo. Additionally, seven body camera videos of the three officers who were present were admitted into evidence as joint exhibits. The trial court granted the motion, and the state now appeals.

## Motion to Suppress Testimony

{¶5} Deputy Rylan Babbs was working as a patrol officer for the Hamilton County Sheriff's Department ("HCSO") when he heard a "Be on the Lookout" ("BOLO") call for a Hyundai Sonata that had been involved in a shooting. When he ran the license plate number of the Sonata, he learned the car was registered to Washington, whose address was in Columbia Township. Babbs and his partner, Deputy Todd Rizzo, drove to that address. When they arrived, Arthur Smith had just exited from a white Escalade and was walking toward Shavonda Washington who was standing outside in the front yard of her home.

{¶6} When Babbs ran the license plate number of the Escalade, he discovered that the car was registered to Washington and had been reported stolen the previous day. Babbs exited from his cruiser as Smith was walking across the street. Babbs and his partner Rizzo detained and handcuffed Smith and placed him in a cruiser. After speaking with Washington, Babbs ran Smith's name and learned he had outstanding charges and warrants for his arrest, and Smith was placed under arrest. One of the charges was for unauthorized use of a vehicle filed on October 3, 2019.

{¶7} Babbs testified that he told Washington he was required to search the car because it had been reported stolen, and she consented to the search. Babbs also characterized the search as an inventory search. According to their policy, stolen vehicles are towed and inventory searched to document any valuable items in the car. Although Babbs initially told Washington that the car would not be towed, he testified that Rizzo later told him that he was mistaken because they needed the supervisor's authorization to release the vehicle to Washington. While awaiting

3

authorization, Babbs searched the car, focusing on all of the immediate areas that Smith could reach from the driver's side and looking for items of value to mark on a tow sheet. When he opened the center console, he found a gun.

{¶8} On cross-examination, Babbs testified that he had previously given Smith a traffic citation when he was driving the Escalade, and he knew that Smith had been driving the car for a long time. Babbs completed a "Uniform Incident Report" and had written that the "search [was] incident to arrest" and he had conducted "a wingspan search of the vehicle for officer safety." Babbs confirmed that Smith had been in the cruiser for over 20 minutes when he searched the car. Although he testified that he conducted an inventory search, Babbs conceded that he did not complete the required inventory report and did not tow the car. Babbs acknowledged that when he told Washington he was going to search the car, she responded, "Okay."

{¶9} Rizzo testified that he was a patrol officer for HCSO who worked primarily in Silverton. On that evening, he was backing up the Columbia Township officer. When the officers learned the car Smith was driving had been reported stolen, they detained Smith. The previous day, the car had been reported stolen to the Cincinnati Police Department ("CPD"), so the vehicle was the jurisdiction of CPD. Rizzo had to consult with CPD to determine whether to tow the vehicle. CPD did not want to tow the car, and his supervisor told him to tow the car if Washington wanted it towed. Rizzo testified that they searched the car because they believed it was going to be towed because the car was reported stolen.

{¶10} On redirect, the state had Rizzo identify the affidavit and complaint for an unauthorized-use-of-a-vehicle charge completed by Officer Shack on October 3,

4

2019.  The affidavit and complaint were admitted as exhibits.

Body Camera Video Recordings

{¶11} At the end of the hearing, seven body camera videos files were admitted into evidence.  The court confirmed that all of the video files were being admitted for its review, and that excerpts from files 3 and 7 were played in court.

{¶12} When the videos begin, Smith was legally parked on the street and exiting from the Escalade.  While Smith was crossing the street and walking toward Washington's house, she was walking toward the street where Babbs and Rizzo were standing.  The officers stopped Smith, handcuffed him, and frisked him.  When Rizzo informed Washington that the car had been reported stolen, Smith told him that the car had not been stolen.  He further explained that he had just learned that the car had been reported stolen, and he was bringing it back to Washington.  Rizzo told Smith that the car would be returned to Washington.  While Rizzo placed Smith in the back of a cruiser, Babbs went to speak with Washington.

{¶13} Washington explained that she and Smith have a child together, and he has had access to the car although the car is registered to her.  She had lost her car keys, so they were sharing his keys.  Washington acknowledged to Babbs that Smith has had access to the car, and that Smith had been driving the car weeks ago when Babbs issued him a traffic citation while Smith was picking up their son from school.  Washington confirmed that Smith had been driving the car for a long time.  She told Babbs, "Well, you can't say it was stolen.  We bought it together."

{¶14} Washington and Smith had broken up, and he had moved out of her home approximately a month prior.  Washington was trying to mend the relationship, but when Smith rebuffed her efforts, she told him that if he did not

return the car, she would report it stolen. That same day, she reported it stolen, and he returned the car the following morning. Washington repeatedly told Babbs that she did not want to prosecute Smith because he returned the car.

{¶15} Babbs asked Washington if she wanted to check the car with him to see if Smith had left any of his possessions in the car. Washington said that everything in the car belonged to Smith except for two televisions that were hers. She asked if she could check to see if her televisions were still in the car, and Babbs asked her to give him a few moments.

{¶16} Babbs conferred with Rizzo and explained that Smith usually had access to the vehicle, and that at most, he would be charged with unauthorized use of the vehicle. However, Washington did not want to pursue a criminal charge. Smith again told Rizzo that he had just learned from the officer that she had reported the car stolen. He also told Rizzo that the car was his, and his money was in the car.

{¶17} Babbs and Rizzo removed Smith from the cruiser and performed a comprehensive search of him and returned him to the cruiser. After the search, they both turned off their cameras. When Babbs turned his camera back on, he approached Washington and checked her identification to confirm that the car was registered to her. Then he told her, "Here about two or three minutes, I'm going to go through that truck." Washington responded, "Okay." Babbs further explained:

> So um that's something we got to do for a stolen vehicle. You said your
> TV's [sic] are in there, you need back. So usually what we have to do
> for a stolen vehicle is like tow them away, but it's already here at your
> house, so we're not going to do all that, to get it fingerprinted and all
> that cause we already know who drove it. So, couple more minutes,

6

I'm going to go through the truck then give you your keys back and we'll be out of your hair.

{¶18} Then Babbs conducted a thorough search of the vehicle. He searched every compartment and reviewed every piece of paper he found. The car contained a suitcase, bags of clothing and multiple pairs of shoes. When he opened the center console in the front seat, he found a firearm. While he continued to search the car, a third officer arrived. That officer searched the car again. He also questioned Washington. When he asked her how Smith got the car, she answered, "He had it. It was his, it was mine. It's in my name." She further explained that Smith had a right to drive the car.

### Factual Findings and Legal Conclusions

{¶19} The trial court issued a written decision sustaining the motion to suppress. In concluding that Smith had standing to object to the search, the court found that Babbs knew that Smith regularly drove the vehicle before the October 4, 2019 date of arrest, and Washington admitted that Smith had had permission to drive the car, but as of October 3, 2019, she sought the return of the car. Prior to the search, Washington told the officers that Smith had access to and had been driving the vehicle. Washington reported the vehicle stolen the day before Smith's arrest, and when Smith was arrested just outside of her home, she acknowledged that Smith was returning the vehicle to her. "There was ample evidence that Smith regularly drove the vehicle with Washington's permission before October 4, 2019, when he was arrested. Although the vehicle is solely titled in Washington's name, she allowed him to use it."

7

{¶20} The court further found that Smith routinely drove the vehicle, and Washington and Smith shared the same set of keys. Deputy Babbs acknowledged that the vehicle had not been stolen, and "If anything, it's just going to be unauthorized use. I don't think she wants to do much with it now." Before the search of the vehicle, Washington told the officers that Smith had access to and had been driving the vehicle, and she did not want to pursue charges against Smith. Based on these facts, the court concluded that Smith had an expectation of privacy in the vehicle that society was prepared to recognize as reasonable.

{¶21} The court also found that the search was not consensual or a reasonable inventory search. Washington did not consent to the search. "The video clearly shows Officer Babbs telling Washington 'I'm going to go through that truck.' The officer did not ask her for consent." Her response was a mere submission to authority. The search was not a reasonable inventory search because:

> the car was not legally impounded or towed, the owner was present to receive it, and there was no need to keep the personal items in the vehicle safe. The car was legally parked on the street. Moreover, the video of the search showed that the officers were sifting through the vehicle in order to find evidence of a crime.

{¶22} Raising one assignment of error, the state contends that the trial court erred when it granted Smith's motion to suppress the firearm found during the search of the car. Specifically, the state argues that Smith did not have standing to challenge the search, Washington consented to the search, and the search was a proper inventory search.

Standard of Review

{**¶23**} Appellate review of a decision on a motion to suppress presents a mixed question of law and fact. *State v. Showes*, 1st Dist. Hamilton No. C-180552, 2020-Ohio-650, ¶ 9. Because the trial court is in the best position to resolve factual questions and evaluate witness credibility, we must accept the trial court's findings of fact if they are supported by competent and credible evidence, but we review de novo the application of the relevant law to those facts. *State v. Johnson*, 2013-Ohio-4865, 1 N.E.3d 491, ¶ 14 (12th Dist.).

Standing

{**¶24**} The Fourth Amendment serves to protect an individual's subjective expectation of privacy if that expectation is reasonable and justifiable. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Katz v. United States*, 389 U.S. 347, 381, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *State v. Buzzard*, 112 Ohio St.3d 451, 2007-Ohio-73, 860 N.E.2d 1006. Thus, an individual must have standing to challenge the legality of a search or seizure. *State v. Coleman*, 45 Ohio St.3d 298, 306, 544 N.E.2d 622 (1989). The person challenging the search bears the burden of proving standing. *State v. Williams*, 73 Ohio St.3d 153, 166, 652 N.E.2d 721 (1995). To meet that burden, the person must establish that he or she has an expectation of privacy in the place searched that society is prepared to recognize as reasonable. *Id.*

{**¶25**} "[A]n individual who is in lawful possession of a vehicle, although not the titled owner, does possess a legitimate expectation of privacy in the vehicle searched, if he or she can demonstrate that the owner gave them permission to use the vehicle." *State v. Nicholson*, 5th Dist. Stark No. 2016 CA 00210, 2017-Ohio-

2825, ¶ 23. One who asserts a property or possessory interest in a vehicle demonstrates an expectation of privacy. *See Rakas*, at 148. A legitimate expectation of privacy "must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Byrd v. United States*, ___ U.S. ___, 138 S.Ct. 1518, 1527, 200 L.Ed.2d 805 (2018), quoting *Rakas* at 144. "[A] at a minimum, the proponent bears the burden of establishing 'that he gained possession from the owner or someone with authority to grant possession.' " *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir.2003), citing *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990). "Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle." *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir.1990).

{¶26} The state argues that the trial court erred in concluding that Smith had standing because he failed to present evidence that he lawfully possessed the vehicle at the time of the search. The state further asserts that none of the facts relied upon by the trial court established lawful possession.

{¶27} The trial court determined that Smith had a reasonable expectation of privacy that society was prepared to recognize based on Washington's statements to the officers. She repeatedly told the investigating deputies, before the search of the vehicle, that Smith had access to and had been driving the vehicle for a lengthy period of time. Although the vehicle is registered to Washington, she allowed him to use it. She had lost her set of keys so they were sharing his keys. Deputy Babbs knew

that the defendant regularly drove the vehicle with the permission of the owner in the weeks before October 4, 2019. Washington told the officers numerous times that she did not wish to prosecute him for driving the car.

{¶28} The court further found that Washington herself admitted that the defendant had permission to drive the car, but as of October 3, 2019, she sought its return because they had broken up, and she acknowledged that Smith was returning the vehicle to her. The record supports the trial court's conclusion that Smith regularly had permission to drive the vehicle before October 4, 2019, and that Smith was returning the car to Washington at the time of his arrest.

{¶29} Washington's statements also established that Smith had a possessory or a property interest in the vehicle. Washington stated that the car belonged to both of them, he had a right to drive it, and they had "bought it together." Washington admitted that all of the possessions in the car belonged to Smith except for the two televisions. The car contained a suitcase and bags with Smith's clothing and several pairs of shoes. Smith referred to the car as "his," and told the officers that the car had not been stolen. He had just learned that the car had been reported stolen, when he drove to Washington's home. Notably, Washington never told the officers that Smith had stolen the car, and she declined to prosecute him for having the car.

{¶30} Accordingly, based on the unique facts and circumstances in this case, Smith established that he had standing to object to the search.

### The Search of the Vehicle

{¶31} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide for "[t]he right of the people to be secure * * * against unreasonable searches and seizures * * *." Searches and seizures

11

conducted without a prior finding of probable cause by a judge or magistrate "are per se unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *State v. Tincher*, 47 Ohio App.3d 188, 548 N.E.2d 251 (12th Dist.1988).

{¶32} When an individual voluntarily consents to a search, no fourth amendment violation occurs. *See United States v. Drayton*, 536 U.S. 194, 207, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (stating that "[p]olice officers act in full accord with the law when they ask citizens for consent"). The question of whether a consent to search was voluntary or was the product of duress or coercion is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The state has the burden to prove, by clear and convincing evidence, that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *State v. Jackson*, 110 Ohio App.3d 137, 142, 673 N.E.2d 685 (6th Dist.1996), citing *State v. Danby*, 11 Ohio App.3d 38, 41, 463 N.E.2d 47 (6th Dist.1983). "Proof of voluntariness necessarily includes a demonstration that no coercion was employed and that consent was not granted 'only in submission to a claim of lawful authority.' " *Jackson* at 142, quoting *Schneckloth* at 233.

{¶33} Here, Babbs informed Washington that, "I'm going to go through that truck." When Washington responded, "Okay," Babbs further explained, "So um that's something we got to do for a stolen vehicle." Babbs did not ask Washington if he could search her vehicle. "Rather, this was going to be an immediate search of the vehicle and mere acquiescence to authority does not constitute consent." *State v.*

*Williams*, 2d Dist. Montgomery No. 22924, 2009-Ohio-1627, ¶ 15, citing *Bumper*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797, as cited in *State v. Lane*, 2d Dist. Montgomery No. 21501, 2006-Ohio-6830, ¶ 39.

**{¶34}** After reviewing the totality of the circumstances, we hold that there was competent, credible evidence presented at the suppression hearing to support the trial court's determination that Washington did not freely and voluntarily consent to the search.

**{¶35}** An inventory search of a lawfully impounded vehicle is a recognized exception the general prohibition against warrantless searches. *State v. Hathman*, 65 Ohio St.3d 403, 405-406, 604 N.E.2d 73 (1992). The inventory search must be conducted in good faith and "in accordance with reasonable standardized procedure(s) or established routine." *Id.* at paragraph one of the syllabus. "While those procedures need not be in writing, the state must show that the police department has a standardized routine policy, and that the officer's conduct conformed to that policy." *State v. Ojile*, 1st Dist. Hamilton Nos. C-110677 and C-110678, 2012-Ohio-6015, ¶ 61. "The Ohio Supreme Court has held that 'inventory searches of lawfully impounded vehicles are reasonable under the Fourth Amendment when performed in accordance with standard police procedure and when the evidence does not demonstrate that the procedure involved is merely a pretext for an evidentiary search of the impounded vehicle.' " *State v. Foster*, 2017-Ohio-4036, 90 N.E.3d 1282, ¶ 24 (1st Dist.2017), quoting *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 22.

**{¶36}** The trial court found that the search was not a reasonable inventory search. The car was not legally impounded or towed, the owner was present to

receive it, and there was no need to keep the personal items in the vehicle safe. The car was legally parked on the street. Moreover, the video of the search showed that the officers were sifting through the vehicle in order to find evidence of a crime.

{¶37} The state argues that Babbs's testimony that he was mistaken in telling Washington that he would leave the vehicle with her because the decision had not yet been made coupled with his testimony that department policy required the towing of a stolen vehicle was sufficient to establish the search was an inventory search.

{¶38} However, a review of the record does not support the state's assertions. Prior to the search, both Babbs and Rizzo stated that the car would be returned to Washington, undermining Babbs's testimony that Rizzo had told him that he was mistaken and needed authorization from the supervisor. Moreover, both acknowledged that the vehicle had not been stolen, and that at most, Smith was not authorized to use the vehicle.

{¶39} Although Babbs testified that he conducted an inventory search, he admittedly did not have or complete the required inventory report while conducting the search, and after completing the search, he did not tow the car. Babbs did not testify regarding the details of the policy, such as the policy for opening and searching compartments and closed containers, and the policy was not introduced at the hearing. A review of the video reveals that Babbs extensively searched the vehicle, including opening compartments, a suitcase, and closed bags. Finally, Babbs wrote that the search was incident to an arrest on the "Uniform Incident Report."

{¶40} Based on this record, we cannot say the trial court erred in concluding that the search of the vehicle was not a "reasonable" inventory search under the

14

Fourth Amendment and the evidence demonstrated the procedure was a pretext for an evidentiary search. *See Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, at ¶ 22. The state failed to prove the search was made "pursuant to standard police procedures" and for the purpose of "securing or protecting the car and its contents." *See id.*

## Conclusion

{**¶41**} We overrule the state's sole assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**CROUSE** and **HENDON, JJ.,** concur.

**SYLVIA SIEVE HENDON**, retired, from the First Appellate District, sitting by assignment.

Please note:
> The court has recorded its own entry this date.